# The People of the State of Illinois v. The Lake Street Elevated Railroad Company.

1. QUO WARRANTO—*Allowance of Writ Exhausts Discretionary Power of the Court.*—When the writ of *quo warranto* has been allowed, the discretionary power of the court or judge granting it is exhausted, except when the order is made under a misapprehension of some material fact, but for which the order would not have been made.

2. SAME—*When Granted Under Misapprehension of Facts.*—Where the writ has been granted under a misapprehension of facts it is competent for the court to vacate the order granting it at any time during the term.

3. SAME—*Practice Where the Writ Has Been Properly Granted.*—Where the writ has been granted without any such misapprehension, the issues of fact and of law presented by the pleadings must be tried and determined in accordance with the rules of law in the same manner and with the same degree of strictness as in ordinary cases.

4. SAME—*Practice—Mode of Instituting the Pleadings.*—The mode of instituting *quo warranto* proceedings is usually for the state's attorney to submit a motion based on affidavits for leave to file an information in the nature of *quo warranto*. A rule *nisi* is made on defendant to show cause why the information should not be filed. The respondent may answer the rule by counter-affidavits.

5. SAME—*Leave Not Granted as a Matter of Course.*—The general rule is, that leave to file an information is not to be granted as a matter of course, but depends upon the sound discretion of the court and the circumstances of the case.

6. SAME—*Not a Private Remedy.*—If a wrong is done by the abuse of a franchise, it is a public wrong, and a proceeding by *quo warranto* must be had by the public prosecutor or other authorized agent of the State. A private citizen can not in such cases have the aid of this extraordinary remedy.

7. SAME—*Authority of Attorney-General.*—The authority of the attorney-general or state's attorney to file an information affecting public rights only, must be in his official capacity under a sense of official duty, and not merely the lending of his name for the use of a private party. The proceeding must be official in fact, and not simply official in form, but private in fact.

8. SAME—*Abuse of the Process.*—The Circuit Court, in the exercise of its discretion, is authorized to take into consideration the circumstances showing the character of the proceeding, and if satisfied that the purpose is merely to allow a private party to institute proceedings in a matter concerning the public alone, it is its duty to refuse to allow the information to be filed.

9.  SAME—*Statute of Limitations—Lapse of Time—Public Policy.*—After a considerable lapse of time, public policy forbids that discretionary writs like those of *quo warranto* and *certiorari* should be granted. The right to file the information should be refused on the ground of public policy where there has been such a lapse of time that a wrong would be done in granting the writ.

10.  SAME—*Not a Remedy for Purpresture.*—*Quo warranto* is not a remedy for purpresture. A judgment of ouster will not take down a structure, nor can one of seizure pass the property in it to the State.

11.  CITIES AND VILLAGES—*Power To Grant Use of Streets for Railroad Purposes.*—A city council has the power to grant the use of a street for railroad purposes, when, in its judgment, the public good demands it; subject, however, to the provisions of the law requiring the consent of property owners.

12.  CORPORATIONS—*Ultra Vires—Waiver by State.*—Where a corporation, by the exercise of powers not conferred by its charter, does no private injury and commits an offense against the public alone, the State may punish or waive the right to do so, as in the judgment of those intrusted with the appropriate power in that respect, may be deemed most in consonance with the public interests.

13.  VACATION—*Power of Judges in.*—A judge in vacation, making an order, can not, in vacation, set it aside, since in vacation the judge has no other judicial power than that given him by the statute.

14.  TERM TIME—*Powers of Judges in.*—In term time, the court has generally, so long as the proceedings are *in fieri*, the power to undo anything that has been done in the case, whether by the same or by another judge.

**Memorandum.**—*Quo warranto* proceedings. Appeal from the Criminal Court of Cook County; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the March term, 1894, and affirmed. Opinion filed April 30, 1894.

The opinion states the case.

JACOB J. KERN, state's attorney, for appellant; RICHARD PRENDERGAST and WM. B. KEEP, of counsel.

KNIGHT & BROWN, attorneys for appellee.

MR. JUSTICE GARY DELIVERED THE OPINION OF THE COURT.

With very slight additions which will follow Judge Brentano's opinion herein copied, that opinion states the facts involved in this controversy.

That opinion is as follows:

"BRENTANO, J.  On the 5th inst. there was presented to

this court a petition signed by the state's attorney, Jacob J. Kern, together with the affidavits of Valentine C. Brahm, William H. Sullivan, Henry Lovi and Gustaf H. Carlson."

"The petition asked for leave to file an information in the nature of a *quo warranto* against the Lake Street Elevated Railroad Company, requiring said company to appear and show by what authority it uses and claims the franchise of laying, constructing, maintaining and operating an elevated railroad upon West Lake street and other public streets in the city of Chicago, and in support of such application, the state's attorney filed the affidavits of the parties above mentioned, and prayed the court to consider the said affidavits as part of the petition."

"The affidavits of Brahm, Lovi and Sullivan set forth and claimed that no petition of the owners of land representing more than one-half the frontage on West Lake street, between the west line of Canal street and Crawford avenue, was ever filed with the city council, consenting to the construction of an elevated railroad upon Lake street. And further, on information and belief, that the Lake Street Elevated Railway Company which secured certain ordinances on November 24, 1890, was not legally incorporated and never had any legal corporate existence."

Brahm likewise set forth that he was the owner of property known as No. 1099 West Lake street. Sullivan set forth that he was the owner of property known as 1088 West Lake street.

"The affidavit of Lovi set forth that he was a resident of Hinsdale, and was the owner of land fronting on West Lake street on the line of the elevated railroad."

"The affidavit of Brahm, Sullivan and Lovi do not appear to have been made upon any personal examination or inspection of the records concerning the matters to which they make affidavit."

"The affidavit of Gustaf H. Carlson, also filed as aforesaid, sets forth more in detail the reason why he claimed there was not sufficient frontage at the time of the passage of the ordinances of November 24, 1890, hereinafter referred to.

" Based upon these documents so filed, the court on October 5, 1893, permitted the information to be filed in the nature of a *quo warranto*."

" The information set forth that the Lake Street Elevated Railroad Company, respondent, is using, without warrant, the franchise of building an elevated railroad upon Lake street, and other public streets, and avers that the railroad company claims that its powers are acquired and derived through certain ordinances passed by the city council of the city of Chicago, and through certain transfer and assignments from a pretended corporation known as the Lake Street Elevated Railway Company; and avers that the railway company was not legally incorporated, for the reason that it was incorporated under an act, entitled, An act concerning corporations, in force July 1, 1872. And that on the 24th of November, 1890, the railway company secured an ordinance to build an elevated railroad upon Lake street, from the west line of Canal street to Crawford avenue, and also on the same date secured the passage of another ordinance, extending the line from Crawford avenue to the city limits, and eastward from Canal street to Market street."

" The ordinances as mentioned are set forth in full in the information."

It sets forth the incorporation of the city, under the act providing for the incorporation of cities and villages, approved April 10, 1872, and the provision of the charter, requiring the petition of the owners of land before the city council shall have the right to grant an ordinance to build an elevated railroad along and upon a public street; and avers that no such consent was given as required by the charter by the owners of property upon Lake street. That an act passed in 1883, in force July 1, 1883, required the consent of property owners in order to authorize the city council to grant permission to build an elevated railroad on a public street; and then avers that there was no such petition presented as required by law, and for that reason the ordinances of November 24, 1890, were utterly invalid.

" That in 1892, the Lake Street Elevated Railroad Com-

pany was incorporated under the act in force March 1, 1872, known as Chapter 114 of the Revised Statutes, and that on the 30th of August, 1892, the railway company assigned and transferred to the railroad company all its rights to the ordinances of November 24, 1890; and afterward, on the 19th of December, 1892, the city council passed an ordinance consenting to, and confirming the transfer from one company to the other."

" That the ordinance of November 24, 1890, authorizing the construction of the road from Canal street to Crawford avenue, provides that if it should not be constructed within two years all rights under the ordinances should cease; avers that the railroad was not completed as required by the ordinances; avers that the railway company not having so completed the railroad, forfeited all of its pretended rights to be conferred by the ordinances of November 24, 1890; and avers that if the railway company had acquired any rights or franchise under the ordinances of 1890, all such rights were forfeited and extinguished by reason of the failure of the railway company to have the railroad built on Lake street from Canal street to Crawford avenue within two years, as required by the ordinances."

" A summons was thereupon issued to the railroad company, in form, as required by law, requiring it to answer the information the 16th of October. The writ was served upon the respondent company on the 13th of October, and on the 14th of October the company filed its demurrer to the information."

" On Monday morning, the 16th inst., on the convening of court, counsel for the respondent entered a motion to vacate the order of the court of October 5th, granting leave to file the information and to abate any further proceedings in this matter, and in support of such motion, filed a number of affidavits."

" The matter was set down for hearing on the 18th inst., and Mr. Keep and Mr. Prendergast appearing as counsel in the case, made a motion to strike from the files the affidavits filed in support of the motion of respondents, to vacate the order of October 5, 1893."

" The court, after argument of counsel, overruled the motion to strike the affidavits from the files."

" Counsel then asked leave to file counter-affidavits to those filed by the respondent."

" Had a rule been entered requiring the defendant to show cause why the writ should not be allowed, doubtless the matter set forth in the affidavits filed might and would have been considered."

" It is clear, however, from the opinion of the Supreme Court in People v. Golden Rule, 114 Ill. p. 44, that when the writ of *quo warranto* has been allowed, the discretionary power of the court or judge granting the same is exhausted, except when the order is made under a misapprehension of some material fact, but for which the order would not have been made. In such case it is competent for the court to vacate the order at any time during the term; and where the writ has been granted without any such misapprehension ' the issues of fact and of law presented by the pleadings must be tried and determined in accordance with the strict rules of law in the same manner and with the same degree of strictness as in ordinary cases.' "

" It is apparent from the foregoing that when such discretionary stage has been passed, and as in this case, the writ has been allowed, the motives that may have, either directly or indirectly, prompted the action, are not a proper subject of consideration. They are not material facts about which a misapprehension or want of knowledge on the part of the court or judge granting the order for the writ, could be alleged, so as to bring the case within the exception recognized in People v. Golden Rule."

" Material facts are those which relate to the merits of the cause of action or defense—facts which are within the issues to be tried and which may be made available on the trial as completing the cause of action or defense."

" It can not be seriously contended that the motives prompting this action can be made a part of the issue to be tried herein within the recognized principles of pleading and practice governing this class of cases."

"I am therefore of the opinion that the motion to quash the writ can not be sustained upon the grounds set forth in some of the affidavits and this disposes also of the motion for leave to file counter-affidavits. I am of the opinion that such counter-affidavits should be allowed, were I to attempt to determine the truth of the matters set forth in some of the affidavits in support of the motion to dismiss. The authorities cited by counsel for the respondent relate to the practice upon the question of opening defaults, and are not applicable."

" A motion to dismiss a proceeding of this character upon the ground of abuse of process is quite a different question."

" It may be said to raise an issue *de hors* the record—to be tried upon affidavits, and it would be strange indeed if only one party were to be heard. Suppose notice of the application for the writ in this case had been given, and the defendant had come in with the matters charged in the affidavits, before the writ was allowed; it would have been most extraordinary to have denied the state's attorney the right to reply, and certainly if the question of motives or purposes were to be tried now, the same privilege should be accorded to the state's attorney."

" The question now is, whether the court, in the exercise of its discretionary powers, should sustain the motion made by respondents to vacate the order of October 5th (the term of court not having passed), and abate any further proceedings in this cause."

" The mode for instituting *quo warranto* proceedings is usually as pursued in the case at bar. The state's attorney submitted a motion based on affidavit for leave to file an information in the nature of *quo warranto*. A rule *nisi* was made on defendant to show cause why the information should not be filed. Respondent answered the rule by counter-affidavits. This practice is warranted by the authorities. People v. Shaw, 14 Ill. 476; King v. Symons, 4 Term R. 221; People v. Tibbits, 4 Cowen, 383; People v. Richardson, 4 Cowen, 103 and notes."

" For cause shown the court, no doubt, has a discretion to

grant or refuse the leave asked according to the circumstances."

In the case of People v. Moore, 73 Ill. 134, the court, in speaking of the practice in this class of cases, says:

"The general rule is, that leave to file an information is not granted of course, but it depends upon the sound discretion of the court upon the circumstances of the case."

"In referring to the amendment of the act concerning *quo warranto* proceedings, in force July 1, 1874, the court further says:"

"It is contended that by this statute the former practice of making a rule to show cause why the information should not be filed, has been abrogated, and can not now be followed; that if probable ground for the information is shown on the face of the petition, then the court must grant the petition, and the word 'may' in the statute may be taken as meaning 'must.'"

"Doubtless the court or judge may grant the petition without any rule to show cause, and it may be the statute contemplates, as the usual course, that the court or judge should act, in view of what appears on the face of the petition, on the *ex parte* application. But we do not perceive any substantial ground for complaint in the course which the court saw fit to pursue in the present instance. It does not appear that the court was satisfied that there was probable ground for the proceeding so as to require it to order the information to be filed."

"In that case a petition was filed by the state's attorney and a motion made for leave to file the information. This motion the court overruled and then entered a rule on the defendants to show cause. Afterward the state's attorney moved that the rule to show cause be vacated, for the reason that the recent statute had changed the form of practice and dispensed with the common law rule to show cause that motion was overruled. The state's attorney then entered a motion to strike from the files the answer of defendants and the affidavits in support thereof. That motion the court overruled."

"Afterward the rule to show cause came on to be heard, the only evidence in the case being the petition, the answer of the defendant and the sworn affidavits filed in support thereof. This the court, as indicated in the above proceedings, held to be the proper practice."

"In the case of People v. North Chicago Railway Company, 88 Ill. 538 (decided at the September term, 1888), a petition was filed by the state's attorney for leave to file an information. An affidavit was filed on behalf of the respondent. And the court, speaking through Chief Justice Scholfield, says:"

'The ruling of this court, the granting of leave to file an information in the nature of a *quo warranto*, is in the sound discretion of the court to which or judge to whom the application is made. Leave on the one hand is not granted as a matter of right upon the part of the relator, and, on the other hand, the court is not at liberty to arbitrarily refuse, but must exercise a sound discretion in accordance with the principles of law.'"

"In the case of people v. Hamilton, 24 Ill. App. 613, (decided in 1887), the court says: 'It is familiar that in proceedings by *quo warranto* the court may, in the exercise of a sound legal discretion, refuse leave to file the information.'"

"And in the case of People ex rel. v. Golden Rule, 115 Ill. 45 (decided in 1885), the court, in discussing the statute of 1874, seem to indicate that the granting of leave to file an information exhausted its discretionary powers, but the court in that case further says:"

'It is not denied that if the order to issue the summons had been made under a misapprehension of some fact material to be known by the court before making such order, and but for which it would not have been made, it would have been competent for the court to vacate the order at any time during the term.'"

"It would seem under the authorities cited, and under the statute of 1874, that ordinarily the discretion of the court in the issuing of the writ exhausted its powers, unless dur-

ing the term at which the order is made some fact comes to the knowledge of the court, which, if known before making such order, it would not have been made, it would be competent for the court to vacate the order during the term."

." And if the court is not satisfied that there is some fact, material to the issues in this case, which if known at the time, it would not have made the order of October 5th, then it is my bounden duty to set aside that order, and take such proceedings under the law as I deem consistent with right and justice."

" It also appears that since the passage of the ordinance of November 24, 1890, the railway company and railroad company have proceeded with the work of constructing the road under said ordinance, and has expended in such construction, relying upon the good faith and validity of such ordinance, nearly $2,000,000; that it has built and equipped, and has now ready for operation, over four miles of its structure over the route described in said ordinance."

" It appears from some of the affidavits filed, that the company intends to begin the operation of trains on the 28th of October, 1893, claiming that its road will be ready for the receiving and discharging of passengers at that date."

" It also now appears, that relying upon the validity of such ordinances, it has caused to be issued a mortgage to secure bonds for the amount of $6,500,000; that about $3,000,000 of said bonds have been issued, and are now in the hands of investors who have purchased said bonds in good faith, relying upon the right of the company to construct, maintain and operate such elevated railroad."

" That on May 15, 1893, the city council of the city of Chicago granted an ordinance to respondent company, ratifying and confirming the rights theretofore had under the ordinances of November 24, 1890, to build its road from Canal to Market street."

" It appears also, that on October 4, 1890, the commissioner of public works made a report to the city council in regard to the frontage signed by property owners consenting to the construction of an elevated railroad by the Lake street road."

" Affidavits have also been filed by the secretary of the company and by two others, each of whom state that there was filed with the city council. of the city of Chicago, the frontage as required by law."

" Since these proceedings were commenced there have also been read to the court, resolutions passed by the city council of the city of Chicago, requesting the state's attorney of this county to dismiss those proceedings."

"The council have also strenuously insisted that unless these proceedings should be maintained, the rights of owners of property upon Lake street would be jeopardized, for the reason that they would be without remedy for whatever damages they may have suffered by reason of the construction and operation of this road."

" It is not claimed, by counsel in this case, that any action has been taken by any public body representing the people, demanding the institution of these proceedings, in the name and on behalf of the people."

" It also appears that the parties interested in carrying on this great public work have proceeded in the preparation of this road for the carrying of passengers, upon the good faith of the several ordinances passed by the city council."

" The question is, whether the public interests or public policy demands the institution of these proceedings by and on behalf of the people, and also as to what is the duty of the court if it comes to the conclusion that these proceedings are not required by and on behalf of the people."

" It can not be denied that the elevated railroad system in the city of New York has been a great boon to that city, without which people would have been without adequate means of intramural transportation. In the south division of this city, an elevated railroad has been constructed and is now in operation, and without it the means of transportation to the World's Fair would have been wholly inadequate to the demands of the people."

" It is conceded that the building of the Lake Street Elevated Railroad will furnish to the people of the west division of the city of Chicago additional means of transportation over that now given."

The People v. Lake St. Elevated R. R. Co.

" If the owners of property abutting upon that street are injured or damaged by the construction or operation of this elevated railroad, then they have their remedy in their own name, and in their own right. It is not in consonance with justice that the name of the people should be used in a proceeding like this one, if there is injury to the public good to be prevented."

" In the case of Moses v. Railroad Company, 21 Ill. 522, Judge Caton, in speaking for the court, says :"

' It must necessarily happen that streets will be used for various legitimate purposes which will, to a greater or less extent, discommode persons residing or doing business upon them, and just to that extent damage their property; and yet such damage is incident to all city property, and for it a party can claim no remedy. The common council may appoint certain localities where hacks and drays shall stand waiting for employment, or where wagons loaded with hay or wood or other commodities shall stand waiting for purchasers. This may drive customers away from shops or stores in the vicinity, yet there is no remedy for the damage. A street is made for the passage of persons and property, and the law can not define what exclusive means of transportation and passage shall be used. Universal experience shows that this can best be left to the determination of the municipal authorities, who are supposed to be best acquainted with the wants and necessities of the citizens generally. To say that a new mode of passage shall be banished from the streets, no matter how much the general good may require it, simply because streets were not so used in the days of Blackstone, would hardly comport with the advancement and enlightenment of the present age. Steam has but lately taken the place, to any extent, of animal power for land transportion, and for that reason alone shall it be expelled from the streets ? For the same reason camels must be kept out, although they might be profitably introduced. Some fancy horse or timid lady might be frightened by such uncouth objects. Or is the objection not in the motive power used, but because the carriages are larger than were

formerly used, and run upon iron and are confined to a given track in the street? Then street railroads must not be admitted, for they have large carriages which run on iron rails and are confined to a given track. Their momentum is great and may do damage to ordinary vehicles or foot passengers. Indeed, we may suppose or assume that streets occupied by them are not so pleasant for other carriages, or so desirable for residences or business stands as if not thus occupied. But for this reason the property owners along the street can not expect to stop such improvements. The convenience for those who live at a greater distance from the center of a city requires the use of such improvements, and for their benefit the owners of the property upon the street must submit to the burden when the common council determine that the public good requires it. Cars upon street railroads are now generally, if not universally, propelled by horses, but who can say how long it will be before it will be found safe and profitable to propel them with steam or some other power besides horses? Should we say that this road should be enjoined, we could advance no reason for which it would not apply with equal force to street railroads; so that consistency would require that we should stop all. Nor would the evil which would result from the rule we must lay down stop here. We must prohibit every use of the street which discommodes those who reside or do business upon it, because their property will be damaged.' "

" The case quoted from has been followed by many cases since in the Supreme Court of our State, so that it is now the settled doctrine of the law in this State, that the city council has the power to grant the use of the streets for railroad purposes, when in its judgment the public good demands that the same be done; subject, however, to the provisions of the law requiring the consent of property owners."

" The city council in this case has declared that the public good demands that additional means of transportation should be given to the people of the west division of the city, by means of an elevated railroad upon Lake street. The

court has no right to disregard this declaration by the city council."

"The public good, therefore, under the decision of the Moses case quoted from, must be held to have demanded the construction and operation of this elevated railroad upon Lake street. If the public good demanded the construction and operation of this elevated railroad, certainly there could not be, of necessity, any injury or damage to the public interests."

"As stated by the court in the Moses case, while the building of this road may discommode those who reside and do business upon it, yet, can the courts, when the city council has declared that the public good requires the building of this railroad, step in and say that it will exercise its judgment in the place of the representatives of the people to whom this power has been delegated ?"

"The claim is made in the information filed in this case, that by reason of the fact that the railway company did not have its road constructed and in operation by the 24th day of November, 1892, that therefore all of its rights under said ordinance ceased."

"In the opinion of the court the question as to the rights of the company under that ordinance has been settled by the Supreme Court of this State in the case of the Chicago Street Railway Company v. People, 73 Ill. 541."

"It would seem, therefore, that every question raised by this information, except the one hereafter stated, has been settled by our own courts beyond controversy, and the only remaining question raised by the information is as to whether or not there was a petition before the city council signed by the owners of property, as required by law."

"It should be borne in mind, the ordinances sought to be declared invalid under this proceeding, were passed nearly three years ago, and no attack made by the State or city against the validity of the same for want of sufficient signatures. And since the passage of the same, the city council, on May 15, 1893, re-confirmed the right of the company thereto and extended the authority of the company to

build about thirty miles of additional railroad, and all this time without any protest from the State or city against the validity of the ordinance."

"Does public policy demand that, at this late day, such action of the city council should be called in question by the court? 'Public policy is that principle of law which holds that no subject or citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.' People ex rel. v. Chicago Gas Trust, 130 Ill. 268."

"Is it for the public good to test the question of the validity of said ordinances, by reason of the want of frontage, as required by law, as alleged in this case?"

"The public good would seem to demand this additional means of transportation."

"It was not shown to the court in the argument of this motion, nor was it contended that there was any injury to result to the public, as a public, by reason of the building and operation of this railroad, nor was it contended that the public good was injured or interfered with by the construction and operation of this road."

"The court must therefore hold that it finds no injury to the public interests by reason of the construction and operation of this elevated railroad. That if there be any injury at all, it is simply an injury to private interests. The city council, who, as the Supreme Court in the Moses case says, has the right to declare what is for the public good, has declared that the public good demands the construction and operation of this road, and that the public interests do not demand the institution of these proceedings nor the removal of this road from Lake street."

"Such being the case, the court, under the premises, must hold that the name of the people should not be permitted to be used in a proceeding of this kind except where a wrong is being done the public."

"And in the case of People ex rel. v. The Chicago Railroad Company, 88 Ill., the Supreme Court says:

"'Where a corporation, by the exercise of powers not con-

ferred by its charter, does no private injury and commits an offense against the public alone, the State may punish or waive the right to do so, as in the judgment of those intrusted with the appropriate power in that respect may be deemed most in consonance with the public interests. If a wrong is done by the abuse of a franchise, it is a public wrong, and a proceeding by *quo warranto* must be made by the public prosecutor or other authorized agent of the State, and a private citizen can not in such case have the aid of this extraordinary remedy.'"

"And in speaking of the authority of the attorney-general or state's attorney to file an information affecting public rights only, "must act in his official capacity under a sense of official duty, and not merely lend his name for the use of a private party; and the proceeding must be official in fact, and not simply official in form, but private in fact."

"In all matters in which the public alone is concerned, the law has wisely placed the control of legal proceedings in its officers selected for that purpose, and it is never admissible that these proceedings shall be allowed to be used as mere instruments for the gratification of private malice or the attainment of personal and selfish ends."

"The court below, in the exercise of its discretion, was authorized to take into consideration the circumstances showing the character of the proceeding, and if satisfied, as we think it was justified in being, that the purpose was merely to allow a private party to institute proceedings in a matter concerning the public alone, it was not only within its discretion, but likewise its duty to refuse to allow the information to be filed."

"And in the case of People v. Drainage Commissioners, 31 App. Ct., the court say: 'A *quo warranto* is an appropriate remedy only in those cases where the public have, in theory, at least, some interest in the controversy. It may well be doubted whether in the present case any public interest appears. While in form the proceeding is in behalf of the people to test the right to exercise a corporate franchise, yet in fact the interests involved are mainly private, if not wholly so.'"

" And in case of People v. Boyd, 132 Ill. 60, the Supreme Court say : ' If the state's attorney should file information in his official capacity, when in fact he was only representing the private rights of an individual, the court would not be bound to so regard it, if the nature of the case and object sought showed the contrary. This, we think, is clearly deducible from the opinion in People ex rel. v. North Chicago Railway Company, 85 Ill. 537.' "

" In Spelling on Ex. Relief, Sec. 1830, it is said : ' The people of the State have no right to invoke the action of the courts of justice in this form, for the redress of civil wrongs sustained by some citizens at the hands of others. . When the people come into court in the name and right of sovereignty, as plaintiffs in a civil action, they must come upon their own right for relief, to which they are themselves entitled. It is not sufficient for them to show that wrong has been done to some one; the wrong must appear to be done to the public, in order to support an action by the people for redress.' "

" And in Sec. 1829 it is said : ' The court will refuse to forfeit, though the corporation is clearly guilty of a mis-user, where it appears that no injury has resulted to the public. The general rule is, to warrant a forfeiture of corporate franchises for non-user, the mis-user must be such as to work or threaten a substantial injury to the public.' "

" The case of People v. Gas Company, 38 Mich. 154, holds the same doctrine that our Supreme Court does in the 73d Ill., that the right granted by an ordinance to build a railway in the streets is not a franchise, but a mere grant of authority, and rests in contract or license, and in nothing else. And in speaking of this contract, the court says: ' It in no way concerns the State whether the power is granted or withheld, nor whether the corporation has or has not fulfilled its agreements. The injured party has a remedy for any grievance, but the State is no more interested than it would be in the question whether or not a railroad company had lawfully acquired its right of way.' "

" And in case of State v. Railroad Company, 33 N. E. Rep.

1053, in speaking of a right of *quo warranto*, says : ' It is not a suit for the vindication of the proprietary rights of the individual as against the claim of a corporation, the remedies of an individual against a corporation for the recovery of damages to property being the same as against a natural person.' "

" In the case of People v. Brooklyn R. R. Co., 89 N. Y. 75, it is said : "

' In an action of *quo warranto* the attorney-general represents the whole people, and a right of action can be used only where it affects mere individual and private rights.' "

" In the case of People v. Railroad Company, 57 N. Y. 12, the court say : "

" ' The people of this State have not general power to invoke the action of the courts of justice by suits in the name of sovereignty, for the redress of civil wrongs sustained by some citizens at the hands of others.   When they come into court as plaintiff in a civil action they must come upon their own right for relief, to which they are themselves entitled.   It is not sufficient for the people to show that wrong has been done to some one; the wrong must appear to be done to the people in order to support an action by the people for its redress.   The suit now before us seems to have been instituted on a different theory.   It sets forth various acts as wrongful, which, if wrongful, affect no public right.   These wrongs are wrongs to individual citizens and not to the State, and are remediable at the suit of the parties injured only.' " ·

" The question has occurred to this court as to whether the lapse of time alone in this case is not sufficient to bar the people from maintaining the action, if the public interests were affected by the acts complained of."

" In the case of People v. Boyd, it was sought to test the right of certain trustees to hold the office of directors of a certain school district, and the court says : "

" ' We apprehend the statute of limitation and the lapse of time would operate against the prosecution in a given case

in whatever form it might assume. If this were not so, form and not substance, would govern the substantial rights of parties. It would seem to us that this case ought to fall within that class of cases where the statute of limitation should apply, and the right to file the information should be refused on the ground of public policy, even before the lapse of five years, if the time elapsed were such that a wrong would be done by granting the writ. In other words, after a considerable lapse of time, public policy forbids that discretionary writs like those in *quo warranto* and *certiorari* should be granted.' "

"And it was held in that case that three years was such a lapse of time that the court would not permit the acts complained of to be tested by a writ of *quo warranto*."

" If the lapse of time were not sufficient to bar the State from commencing any proceedings in this matter, then no party would be safe in dealing with corporate rights and privileges. This class of ordinances has been defined by our Supreme Court to be property. See Railroad Company v. Railroad Company, 87 Ill. 322."

" Being property, the State has no right to interfere at this late day, and deprive the people who have purchased the bonds of this company of such right of property."

" In the opinion of the Supreme Court in the case of The People v. Boyd et al., 132 Ill. 60, the doctrine is expounded that the right to file the information should be refused on the ground of public policy where there has been such a lapse of time as that " a wrong would be done by granting the writ. (Ibid. page 69.)"

" It is a matter of public notoriety that the enterprise in question is well under way; months and years have passed since it was entered upon, a superstructure extending many miles has been erected, a track laid, large amounts of money have been expended, debts incurred and rights acquired— and to put such an enterprise in peril by means of the present proceedings would certainly be a great wrong."

" No good, therefore, could come to the public to permit this proceeding to be carried on and undo that which has been done."

" The rule in this class of cases being that the State is not bound to show anything, but that if this proceeding is permitted to go on, then the company respondent must show everything, it must show the validity of its ordinance by showing that there was sufficient frontage, if such question can be raised by this proceeding."

"What is then the duty of the court? Should I allow these proceedings to be continued, or should I say that the court will stop where it is now, and allow them to proceed no further?"

" In the case of People v. Hamilton, 24 App. Ct. 609, the court says: ' When it appears that the writ was improvidently issued, the court may well decline to grant the relief sought. The issuing of the writ does not end the discretion of the court, and if the case made by the pleadings is such that leave to file would have been refused in the first instance, the court may decline to proceed to judgment.' Commonwealth v. Cheely, 56 Pa. State 270."

"And in the case of People v. Drainage Commissioners, 31 App. Ct. 219, the court say: ' While in form the proceeding is in behalf of the people to test the right to exercise a corporate franchise, yet in fact the interests involved are mainly private, if not wholly so. The court may decline to proceed with the inquiry when such an aspect is disclosed. The issuing of the writ does not end the discretion of the court, and if the case made by the pleadings is such that leave to file would have been refused in the first instance, the court may abate the proceedings.' "

"And in the 88th Illinois, it was said: ' The court below, in the exercise of its discretion, was authorized to take into consideration the circumstances showing the character of the proceeding, and if satisfied, as we think it was justified in being, that the purpose was merely to allow a party to institute proceedings in a matter concerning the public alone, it was not only within its discretion, but likewise its duty to refuse to allow the information to be filed.' "

Under the decisions which have been quoted from by the court in this proceeding, it was the duty of the court, upon

presentation of the petition in the case, to grant leave to
file the information, as it did, on the 5th day of October;
but under the decisions, the power of the court over the
order did not expire until the end of the term. The motion
to vacate this order having been made during the term of
court, the court has the power to vacate or not, as in its
judgment it may deem advisable."

" The court feels satisfied that it is fully sustained, under
the law of this State, in holding the propositions which it
has therefore set forth, and that it is the bounden duty of
the court, under the law as so found, to say that it will pro-
ceed no further with the inquiry in this case."

" The proceedings, therefore, and order of court granting·
leave to file the information in this case, will be set aside
and vacated, and held for naught, and the proceedings
ordered abated."

The first question that confronts us is whether the court
may review its own action and vacate the order permitting
the information to be filed, not only because of any "mis-
apprehension of some material fact," but because upon
further consideration the court is convinced that it ought
not to have granted the order in the first instance.

We are bound by the decision of the Supreme Court in
People v. Golden Rule, 114 Ill. 34, in the negative, but sub-
mit that the question deserves re-consideration.

That a judge, in vacation, making such an order, may not
in vacation set it aside, may be conceded, since, in vacation,
the judge has no other judicial power than what the statute
gives.

· But in term, the court has generally, so long as the pro-
ceedings are *in fieri*, the power to undo anything that has
been done in the case, whether by the same or by another
judge. Niagara Fire Ins. Co. v. Scammon, 35 Ill. App.
582; Fort Dearborn Lodge v. Klein, 115 Ill. 177; ·Black on
Judg., Secs. 308, 509, 694.

The authority cited by the Supreme Court does not sup-
port their position. High cites only, State v. Brown, 5 R. I.
1, where the court disavowed all right to exercise any dis-

cretion to dispense with the law on the trial of the case upon its merits. " Only that and nothing more." But here the court had on the motion to vacate, notice of " material facts" brought to it, of which it had no previous judicial knowledge.

The petition did not state that any portion of the road had been built. On the motion it did appear that over three miles of road had been built, over $2,000,000 of capital invested, and that the road would be ready to run cars within twenty-three days, at the time the petition was filed.

Nowhere in the papers does it appear that the public can be put to the least inconvenience by the road. It is only outside of the record that we know whether the road is above, below or at the street surface, unless the word " elevated" conveys knowledge.

If we were to decide upon the question of nuisance or no nuisance, the decision would be in the negative, even taking into account all our non-judicial knowledge of the structure. Travel is not impeded.

There may be a purpresture. *Quo warranto* is not an appropriate remedy for that. A judgment of ouster would not take down the structure, nor could one of seizure pass the property in it to the State. Wood on Nuisance, Ch. 3.

The fee of the streets is in the city, or abutting owners; the public have the right of unrestricted use of them for travel, and in that right are not disturbed. The fact that the appellee is a corporation cuts no figure, its right so to be not being in question. Many corporations in this city own buildings in front of which are sidewalks—part of the streets under which vaults, rooms, closets, have been constructed—doubtless under permits from the city—by the corporations. Will informations in the nature of *quo warranto* lie to inquire into their right to occupy?

If private rights are infringed, there are appropriate remedies. For encroachments upon the highway *quo warranto* is not the remedy. The judgment of the Criminal Court dismissing the information is affirmed.